DAYLE ELIESON
United States Attorney
STEVEN W. MYHRE
NADIA J. AHMED
DANIEL R. SCHIESS
Assistant United States Attorneys
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
steven.myhre@usdoj.gov
nadia.ahmed@usdoj.gov
dan.schiess@usdoj.gov

*Representing the United States*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>        v.<br><br>O. SCOTT DREXLER,<br><br>                Defendant. | 2:16-CR-00046-GMN-PAL<br><br>**GOVERNMENT'S SENTENCING MEMORANDUM** |

### I.      Summary of Argument

On Saturday, April 12, 2014, hundreds of miles away from his home, Scott Drexler stood on Interstate 15 with his assault rifle in hand and bearing down on federal law enforcement officers in a wash below him.  Drexler was ready, willing, positioned and one finger's pull away from killing them, because they had, in his view, the audacity to perform their duties and enforce federal court orders.

Drexler pled guilty to obstruction of court order, a misdemeanor.  Relevant conduct during the events of April 2014 through the present reflect how serious his

actions were and how little he takes responsibility for them to this day.   Drexler remains a danger to law enforcement and to the community at large.

The government recommends that he be sentenced to five years of supervised probation.   This sentence is supported by each of the factors provided in Title 18, United States Code, Section 3553(a), the United States Sentencing Guidelines, and the parties' plea agreement.

**II.     Procedural Background**

On March 2, 2016, a grand jury in this district returned a superseding criminal indictment against defendant Drexler and eighteen others in relation to the criminal events that occurred between April 6 and 12, 2014.   On March 3, 2016, Drexler was arrested in Idaho pursuant to that indictment and detained pending trial.

On February 6, 2017, jury trial commenced against Drexler and five other co-defendants.  The jury failed to reach a verdict as to Drexler and the Court declared a mistrial.  On July 10, 2017, the retrial commenced.  Drexler took the stand to testify. During his testimony he acknowledged that he ultimately ended up prone on the freeway with his firearm wedged in the gap between concrete barriers, the barrel



pointing toward the BLM officers below him.                                        But his

1  explanation for taking these positions was that he did not want the officers to see him

2  and feel threatened.



14      On August 22, 2017, the jury acquitted Drexler of most of the charges against

15  him except the assault on a federal officer and the corresponding 924(c) counts.

16  Following declaration of mistrial on these counts, the Court released Drexler from

17  custody.  He was photographed that night wearing a shirt that read "Jury

18  Nullification, No Victim No Crime."

19      On October 23, 2017, defendant Drexler pleaded guilty to a Superseding

20  Criminal Information charging him with one count of Obstruction of Court Order in

21  violation of 18 U.S.C. §§ 1509 and 2, a Class A misdemeanor, for his conduct on April

22  12, 2014.  Pursuant to the plea agreement, the parties each agreed to argue for a

1  sentence of probation, Drexler seeking no less than one year and the government

2  seeking up to five years probation.

3      III.    **Points and Authorities**

4      A.    **Facts**

5

6      The facts of this case are well-known to the Court and recounted here only in

7  summary form.  Evidence adduced at trial showed that Drexler traveled with

8  Parker and Steven Stewart from Idaho on April 11 and drove 10 hours straight

9  through to Bundy Ranch, bringing with them assault rifles, handguns, and

10  ammunition.  Choosing to spend the night at the "militia" camp, Parker, Drexler,

11  and Stewart then went on patrol for two hours.

12      On April 12, Drexler provided security for the Bundys at their staging area.

13  Evidence admitted at trial included photographs and videos showing him standing

14  at the perimeter of the staging area without his tactical vest or rifle.  Evidence also

15  showed that after the Sheriff and Cliven spoke to the crowd, Drexler followed

16  Bundy's order to get his cattle.

17      Drexler was captured in photo and video footage moving from the area used

18  by the Bundy followers as a parking lot across from the ICP to the bridge

19  overlooking the officers in the wash.  By the time he got to the ICP, Drexler had

20  donned his tactical vest and was armed with an assault rifle.  Drexler was well

21  documented standing, walking and kneeling on the bridge all with his rifle in the

22  low ready position, and of course photo after photo showed him prone behind the

23  concrete barriers of the highway with his rifle aimed through the gap in the barriers

24

toward the officers.  Testimonial evidence established that officers saw Parker and Drexler taking these positions and understood from their training and experience that the defendants' presented an imminent threat owing to their superior firing position and their apparent intention to assault the officers.  Officers honed in the tactical tag-team movements Drexler and Parker engaged in on the bridge – understanding these movements for what they were – a deadly threat on the officers' lives.

Evidence also showed that Drexler continued participating in military-style operations after April 12 on public lands designed to keep public lands officers from doing their jobs – specifically at the Sugar Pine Mine in Oregon and Operation Big Sky in Montana.

Evidence also established that Drexler knew that the BLM was in the area enforcing federal court orders, that on April 12, 2014, he heard the BLM officer's announcements that the area was closed pursuant to those court orders, heard the officer directing the crowd to leave and that he remained on the bridge, nonetheless.

**B.     Legal Standard**

Proper sentencing procedure requires that, before imposing sentence, the district court: (1) correctly calculate the Sentencing Guidelines range; (2) treat the Guidelines as advisory; (3) consider the 18 U.S.C. § 3553(a) factors; (4) choose a sentence that is not based on clearly erroneous facts; (5) adequately explain the sentence; and, (6) not presume that the Guidelines range is reasonable.  *United States v. Carty*, 520 F.3d 984, 991-93 (9th Cir. 2008).  This is true for a Class A

misdemeanor conviction as well.  See U.S.S.G. § 1B1.9.  When the court imposes a sentence within the Guidelines range, "'it is probable that the sentence is reasonable'" because the court's application of the § 3553(a) factors accords with the Sentencing Commission's independent application of those factors in the "mine run of cases." *United States v. Blinkinsop*, 606 F.3d 1110, 1116 (9th Cir. 2010) (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)).

It would constitute procedural error, however, for the court to "attach [ ] a presumption of reasonableness to the Guidelines range or weight[ ] the Guidelines range more heavily than other § 3553(a) factors." *Carty*, 520 F.3d at 994.  The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also consider the § 3553(a) factors "in determining the appropriate sentence." *Nelson v. United States*, 550 U.S. 350, 352 (2009).

### C.  Argument.

#### i.    The PSR's Offense Level Computation is Correct.

The PSR correctly calculated the offense level for the Obstruction of Court Order base offense level as 14 and correctly applies a 3-level enhancement for official victim for a total of 17. The PSR is further correct that the defendant may be sentenced to up to five years of probation pursuant to 18 U.S.C. § 3561(c)(2).

#### ii.   A Sentence of Five Years of Probation is Appropriate.

The PSR recommends a sentence of time served because it finds that the guideline range falls in a zone on the Sentencing Table that does not allow for probation.  PSR ¶ 124.  However, the Guidelines in no way prohibit the Court from

imposing a sentence of probation.  *See* U.S.S.G. § 5b1.1(b) (providing for three conditions which preclude a sentence of probation under the Guidelines, none of which are present here).  When the Court does not impose a sentence of imprisonment, the Court may properly impose a sentence of probation, regardless of the offense level under the Guidelines.  The plea agreement expressly states the parties' agreement for a sentence of probation.[1]  Section 3553(a) requires the Court to impose a sentence "sufficient but not greater than necessary to comply" with the factors articulated in subparagraph 2.  18 U.S.C. § 3553(a).  The government submits that the overall nature of the offense and the characteristics of the offender, when combined with the circumstances under which the offense was committed, justify a sentence of five years of probation for defendant Drexler.

**a.      The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense.**

The recommended Guideline sentence is reasonable when considering the seriousness of the relevant conduct at issue.  Drexler committed multiple crimes of violence in concert with Cliven Bundy and his followers in order to threaten and coerce federal law enforcement officers from carrying out their lawful duties.  In so

---

[1] Moreover, following the recommendation in the PSR to impose a sentence of time served would likely result in an illegal sentence. *See United States v. Nichols*, No. 17-5580, 2018 WL 3614574 (6th Cir. July 30, 2018) (holding district court's corrected sentence of "time served" where defendant had served twelve years but the statutory maximum was ten years was unlawful). *See also United States v. Peters*, 470 F.3d 907 (9th Cir. 2006) (holding that the court lacked authority to grant credit of nine days of time served in imposing four month sentence because district court may not compute credit for time served, but rather "the prerogative to grant credits in the first instance rests with the Attorney General, acting through the Bureau of Prisons.") *Id.* at 909.

7

doing, he showed no respect for the law, for the rule of law, for law enforcement officers, for court orders, or for the community.  He was prepared and willing to kill law enforcement officers simply because they were enforcing court orders against Bundy.  He was documented by Reuters photographer stating "he was ready to shoot if fired upon" and he shared this article on his Facebook page.

These officers did nothing more than provide security for civilians tasked with rounding up these cattle.  They took the reasonable measures that law enforcement officers across this country undertake in any operation covering an area and operation of this scale.  Bundy and Drexler thought the BLM used too many officers to do so, so they thought it best to go about and threaten their lives by shooting them.

These officers were sought out and provoked by Bundy and his supporters throughout the days leading to the April 12 assault.  Among other things, the Bundys went so far as to ram an ATV into a dump truck in order to bring the impoundment to a halt on April 9, threatened to shut down a business owner who freely entered into a contract with the BLM to sell trespass cattle, and put out a nationwide call for militia to come to Bundy ranch to confront the BLM.  Drexler answered that call and arrived at Bundy Ranch on April 12, gathering with other supporters at staging area near Bundy's home.

When Drexler arrived he did not find federal law enforcement officers anywhere in this area – indeed there was no federal law enforcement officer located within five miles of Drexler or the staging area.  No snipers were aiming at him, as

he falsely quailed to his Followers. No officers were "abusing him." Drexler saw nothing but the Bundys, their supporters, including the many militia members, and Sheriff Gillespie, who stood on the stage and told Bundy, Drexler and hundreds of Bundy supporters and militia, that the BLM was leaving the area and the impoundment operation was over. But Drexler did not then and there turn around and go home peacefully. Rather, when Cliven Bundy later told the crowd to get his cattle, Drexler followed, and traveled in a stranger's vehicle five miles to the BLM compound, knowing he would confront the BLM officers there. He went to the officers – negating any claim of provocation or self-defense – took a lethally advantageous position over the officers in the wash and then threatened them with an assault rifle in his hands.

And if that was not enough, Drexler continued to threaten law enforcement and glorify his lawlessness up to the time of the Superseding Indictment in this case. Like Bundy, Drexler became a law unto himself and he was determined to use force and threats of force to enforce his view of the law.

Drexler's violent conduct greatly affected the victims in this case. During trial, the Court heard from 15 federal officers, who all testified about their fear on April 12, 2014, and many of whom testified to experiencing trauma after the assault. The Court also heard from five local law enforcement officials, including now Sheriff Lombardo, who similarly testified regarding their fear on April 12. In addition, the Court has detailed victim impact statements from four federal officers describing the deep trauma they suffered as a result of the April 12, assault. *See*

PSR at ¶¶ 65, 66.  For most of the officers in and around the wash on April 12, Eric Parker and Scott Drexler on the I-15 bridge are the embodiment of the deadly threat leveled against them. It is Eric Parker – aka black hat – and his partner Scott Drexler, aka tan hat - bobbing up and down on the I-15 with rifles that officers remember with vivid clarity.  Eric Parker and Scott Drexler, who the next day many of them realized for the first time, had taken the most perfect and deadly positions, laid out, fully protected behind concrete barriers, where he could aim, shoot and kill them with no ability on the officers' part to return fire.

### b. Drexler's History and Characteristics.

Drexler's actions on April 12, 2014, reflect his commitment to using force in opposition to law enforcement whenever *he* deems their actions unlawful.  The events of April 12 made Drexler a hero for others who share this venal mindset.  Drexler embraced that role.  Since April 12, 2014, Drexler continued to celebrate, boast and use the events of April 12 and his role in them to recruit others to his movement.  He, along with Eric Parker, joined the Idaho III% group whose messaging is based on a theme of "resistance" to the perceived tyranny of the federal government.  Drexler participated in two military-style operations designed to prevent public lands law enforcement officers from enforcing their laws on federal public lands at Sugar Pine Mine in Oregon and Operation Big Sky in Montana.

In any interview with undercover officers, Drexler talked about the April 12 events.  He stated

### c.     The Need for the Sentence to Promote Respect for the Law, to Afford Adequate Deterrence and Just Punishment and to Protect the Public.

The recommended sentence will promote respect for the law and afford an adequate deterrence to others.  Drexler has been very public in flaunting his disrespect for the law and has long affiliated with the so-called Militia and Patriot Movements, which ascribe to the belief that the federal government is an enemy of the constitution that must be dealt with by force.  Drexler has confirmed this belief system by his actions and words.

General deterrence is one of the prescribed goals of every sentencing.  18 U.S.C. § 3553(a)(2)(B); *see also United States v. Onuoha*, 820 F.3d 1049, 1055 (9th Cir. 2016 (noting that the government has "an interest in gaining a trial conviction to show others that such conduct will result predictably in conviction and a serious penalty of incarceration"); *United States v. Dyer*, 216 F.3d 568, 570 (7th Cir. 2000) (noting one principal objective of criminal punishment is deterrence).  General deterrence is a significant factor in the present case.  Further, general deterrence depends upon the public seeing some consequence for criminal conduct - not only among potential wrongdoers who may be deterred from committing crimes, but also among law-abiding citizens who need assurance that the criminal justice system will do its utmost to protect law enforcement from harm.

Drexler's conviction is grounded not only in violence and lawless acts, but also in his complete disregard for the rule of law.  Drexler came to Bunkerville for the express purpose of engaging federal law enforcement officers and brought weapons and ammunition with him.

The inescapable corollary, especially in light of his subsequent statements and actions, is that Drexler will do it again – whether by himself and/or by inciting and encouraging others to act. His rhetoric and his conduct relating to these charges make clear that he has not changed his mind about the federal government, federal law enforcement authorities, or the law.  No evidence was adduced during this massive investigation, or during the lengthy trials, to suggest that Drexler has changed his mind about any of his actions on April 12 or about his willingness to repeat them.

Accordingly, the best way to deter Drexler from engaging in future criminal conduct and to protect the public, including law enforcement officers, from such actions, is to place him on probation for five years.  Drexler placed numerous law enforcement and federal officials' lives in jeopardy by his armed participation in the violent confrontation orchestrated by Bundy.  A period of five years probation is, therefore, reasonable under the circumstances of his misdemeanor plea.

///

///

///

///

///

///

///

///

12

1    **IV.    Conclusion**

2        **WHEREFORE**, for all the foregoing reasons, the Court should impose a

3    sentence of five years probation.

4        **DATED** this 2nd day of August, 2018.

5                                                    Respectfully,

6                                                    DAYLE ELIESON
                                                     United States Attorney
7

8                                                    */s/ Nadia Ahmed*
                                                     _____
9                                                    STEVEN W. MYHRE
                                                     NADIA J. AHMED
10                                                   DANIEL SCHIESS
                                                     Assistant United States Attorneys
11
                                                     *Attorneys for the United States*
12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**CERTIFICATE OF SERVICE**

I certify that I am an employee of the United States Attorney's Office.  A copy of the foregoing **GOVERNMENT'S SENTENCING MEMORANDUM** was served upon counsel of record, via Electronic Case Filing (ECF).

**DATED** this 2nd day of August, 2018.


*/s/ Nadia Ahmed*

_____

NADIA AHMED
Assistant United State Attorney